Department of Environmental Services
No. 2012-405

APPEAL OF THOMAS MORRISSEY & a.
(New Hampshire Department of Environmental Services)

Argued: April 17, 2013
Opinion Issued: June 5, 2013

*Bernstein, Shur, Sawyer & Nelson, P.A.*, of Manchester (*Gregory E. Michael* and *Christopher G. Aslin* on the brief, and *Mr. Aslin* orally), for the petitioners.

*Nelson Kinder + Mosseau PC*, of Manchester (*Christopher D. Hawkins* and *Robert F. Callahan, Jr.* on the brief, and *Mr. Hawkins* orally), for the respondent.

DALIANIS, C.J. The petitioners, Thomas Morrissey, Margaret Russell, Dorothy Sears, Reginald Rogers, Richard and Barbara Sanders, Patricia Reynolds, John Chamberlain, John Quimby, Michael O'Donnell, and Robert and Judith Dupuis, appeal a ruling of the New Hampshire Department of Environmental Services (DES) Wetlands Council (Council) affirming the issuance by the Wetlands Bureau (Bureau) of a wetlands permit to the respondent, Town of Lyme (Town). The petitioners argue that, when issuing the permit, the Bureau and Council did not consider the total wetlands impact of the proposed project because they misinterpreted the scope of our ruling in *Morrissey v. Town of Lyme*, 162 N.H. 777, 779 (2011) (*Morrissey I*) and DES's authority under RSA chapter 482-A. We vacate and remand.

The following facts are drawn from the record and our opinion in *Morrissey I*. The petitioners own properties with frontage on Post Pond and the west side of the Clay Brook wetlands. *Morrissey I*, 162 N.H. at 779. The Town owns property on the east side of the Clay Brook wetlands as well as a contiguous parcel with frontage on Post Pond, which is used as a recreation area. *Id.* In December 2004, DES determined that the natural mean high water mark for Post Pond corresponds to a level of three feet on the local staff gauge. *Id.* Subsequently, the Town modified its water release policy to permit the breaching of beaver dams, which had historically controlled the water level of the pond and wetlands, when the water level exceeds the natural mean high water mark. *Id.*

In 2006, the Town obtained a standard dredge and fill permit under RSA chapter 482-A to install a beaver pipe through the controlling beaver dam

in Clay Brook and stabilize the water level at the natural mean high water mark. *Id.* Under RSA chapter 482-A, the wetlands statute, a dredge and fill permit is required before one can "excavate, remove, fill, dredge or construct any structures in or on any bank, flat, marsh, or swamp in and adjacent to any waters of the state." RSA 482-A:3, I(a) (Supp. 2012). In 2007, the Town installed two additional beaver pipes without first obtaining a permit. *Morrissey I*, 162 N.H. at 779. In 2008, the Town again changed its water release policy to maintain the water level at two feet on the local staff gauge, thus lowering the water level and increasing the size of the recreation area. The Town then lowered the two beaver pipes it had installed in 2007, which resulted in a water level of one foot seven inches on the local staff gauge. *Id.* Shortly thereafter, the Town breached the controlling beaver dam, dropping the water level to one foot three inches. *Id.*

In July 2008, the Bureau issued a Letter of Deficiency to the Town, "request[ing] the retention of a certified wetland scientist to delineate the wetlands on its property and the submission of after-the-fact permit applications to retain the unauthorized wetland impacts." In July 2009, the Town submitted two applications to the Bureau: an after-the-fact permit application to retain the two unpermitted beaver pipes it had installed in 2007 and an application to add fill to the recreation area bordering the pond. The petitioners objected to both. On October 21, 2009, the Bureau held a public hearing on both applications. In December 2009, it denied the after-the-fact permit application, but granted the permit to add fill ("add-fill permit").

The petitioners moved for reconsideration, arguing that the Town's "overall plan [wa]s to raise the [recreation] field and lower the pond as part of this single project," and that the permit was based upon an application that was "incomplete at best, and mis-leading at worst," because it did not address all the wetlands impacts of the proposed project. The Bureau denied reconsideration, stating that DES lacked authority to regulate the Town's activity relative to the water level of Post Pond. It explained:

> DES wetlands regulations have no authority relative to control-ling the level of the pond . . . . The Town has the authority to set and lower the water level in the pond by local determination . . . . The DES wetlands regulations have no authority to control the water level in Post Pond — the water level is determined by the Town of Lyme. . . . [T]he effect of the change in water level of the pond, is beyond the scope of the wetlands authority to regulate pursuant to RSA 482-A:3, as it does not represent excavation, dredge, fill, or construction of a structure in wetlands. . . .

[T]herefore [e]ffects to abutters from an activity over which DES has no authority [cannot] be addressed through the DES wetlands permit process.

In June 2011, the petitioners appealed the grant of the add-fill permit to the Council. At their request, the appeal was stayed pending the resolution of *Morrissey I*. *Morrissey I* was decided in December 2011 against the petitioners and, in February 2012, the Town asked the Council to dismiss the petitioners' appeal of the add-fill permit. The Council dismissed the appeal in March 2012 "[c]onsistent with the Supreme Court opinion and the Council's lack of authority over water level disputes." It ruled that the petitioners' argument that the underlying permit application improperly omitted the wetlands impact of the proposed project was barred in part by our finding in *Morrissey I* that the Town's activity relative to the water level of Post Pond did not substantially and unreasonably interfere with the petitioners' use and enjoyment of their property. The Council also stated that "water level determination . . . is outside the purview of both the DES Wetlands Bureau and the Council" because, "absent a specific reference in RSA 482-A:3, I(a) to 'water level changes[,]' the Council does not believe DES . . . ha[s] authority under RSA 482-A over the effects of water level changes." This appeal followed.

Our standard of review of the Council's decision is set forth in RSA 541:13 (2007), which provides:

> Upon the hearing the burden of proof shall be upon the party seeking to set aside any order or decision of the [Council] to show that the same is clearly unreasonable or unlawful, and all findings of the [Council] upon all questions of fact properly before it shall be deemed to be prima facie lawful and reasonable; and the order or decision appealed from shall not be set aside or vacated except for errors of law, unless the court is satisfied, by a clear preponderance of the evidence before it, that such order is unjust or unreasonable.

Although "it is well established in our case law that an interpretation of a statute by the agency charged with its administration is entitled to deference," "[t]he deference afforded . . . is not absolute." *Appeal of Town of Seabrook*, 163 N.H. 635, 644 (2012). "We are still the final arbiter of the legislature's intent as expressed in the words of the statute considered as a whole, and we are not bound by an agency's interpretation of a statute." *Id.* (citations omitted). We review an agency's interpretation of a statute *de novo* and "will not defer to an agency's interpretation if it clearly conflicts with the express statutory language . . . or if it is plainly incorrect." *Id.* (citation omitted); *cf. Greenland Conservation Comm'n v. N.H. Wetlands*

*Council*, 154 N.H. 529, 544-45 (2006) (alleged error "that the wetlands council applied a deferential rather than *de novo* standard of review to the wetlands bureau's legal conclusion" regarding DES's scope of authority under RSA chapter 482-A "would have been corrected . . . when the superior court correctly applied the *de novo* standard of review to the wetlands council's legal determinations").

We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. *DaimlerChrysler Corp. v. Victoria*, 153 N.H. 664, 666 (2006). When the language of a statute is clear on its face, its meaning is not subject to modification. *Dalton Hydro v. Town of Dalton*, 153 N.H. 75, 78 (2005). We will neither consider what the legislature might have said nor add words that it did not see fit to include. *Id.* Furthermore, we interpret statutes in the context of the overall statutory scheme and not in isolation. *DaimlerChrysler Corp.*, 153 N.H. at 666. Our goal is to apply statutes in light of the legislature's intent in enacting them, and in light of the policy sought to be advanced by the entire statutory scheme. *Carlisle v. Frisbie Mem. Hosp.*, 152 N.H. 762, 773 (2005).

On appeal, the petitioners argue that the Council erroneously determined that *Morrissey I* precluded their challenge to the issuance of the add-fill permit. They argue that their appeal is not barred by res judicata or collateral estoppel because it advances a different cause of action from that in their petition in *Morrissey I*. The Town responds that there is no meaningful distinction between the two actions.

■ "The doctrine of res judicata prevents the parties from relitigating matters actually litigated and matters that could have been litigated in the first action." *Morgenroth & Assoc's v. State*, 126 N.H. 266, 269 (1985) (quotation omitted). The doctrine applies if three elements are met: (1) the parties are the same or in privity with one another; (2) the same cause of action was before the court in both instances; and (3) the first action ended with a final judgment on the merits. *Gray v. Kelly*, 161 N.H. 160, 164 (2010). We have defined the term "cause of action" as "the right to recover, regardless of the theory of recovery." *McNair v. McNair*, 151 N.H. 343, 353 (2004) (quotations omitted). It "refers to all theories on which relief could be claimed on the basis of the factual transaction in question." *Aubert v. Aubert*, 129 N.H. 422, 426 (1987) (quotation and brackets omitted).

We find that res judicata does not apply here because our decision in *Morrissey I* did not result in a final judgment on the merits. In *Morrissey I*, the petitioners sought a writ of mandamus from the trial court that DES "violated RSA 482-A[,] 'The Wetlands Act[,]' by classifying the Town of Lyme's plan to reduce the water level in the Post Pond Ecological Area as

a project which does not require a permit." *Morrissey I*, 162 N.H. at 784. The petitioners asked the trial court "to order [DES] not to issue permits that allow dredging or filling of Clay Brook Wetlands, [and] to require the Town to obtain a permit to lower the water level of the Post Pond Ecological Area." The trial court denied mandamus relief and, on appeal, the petitioners asked us to interpret their request for a writ of mandamus as a request for declaratory judgment. We focused upon two paragraphs in the petition that alleged that DES must require the Town to obtain a permit under RSA chapter 482-A and not rely upon New Hampshire Administrative Rule, Env-Wt 303.05(j), the regulatory provision that allows the removal of a beaver dam without a permit. *Id.* We declined to interpret these paragraphs as advancing a request for declaratory judgment, noting that they were merely an ill-pleaded request for mandamus relief. *Id.* at 784-85. The petitioners also argued that the Town's actions relative to the water level of Post Pond constituted a private nuisance and unlawful taking because they interfered with the petitioners' enjoyment of their property. *Morrissey I*, 162 N.H. at 780. We affirmed the trial court's dismissal of the petitioners' claims for private nuisance and unlawful taking because their allegations "f[e]ll short of demonstrating that the Town's activity substantially and unreasonably interfered with the use and enjoyment of their property." *Id.* at 782-83 (quotation and brackets omitted).

In their current appeal, the petitioners argue that DES issued the add-fill permit without considering the total wetlands impact of the project proposed in the add-fill permit application. According to the petitioners, DES issued the permit based upon an impermissibly segmented application that separated "the Town's lowering of the water level of Post Pond and associated wetlands" from "the Town's proposed addition of fill to raise the level of the recreation fields." They argue that DES should have considered the two issues together because "the Town's application to improve the recreation fields by adding fill to raise the fields above the water table . . . and the Town's revision of its Water Policy to lower the water level of Post Pond . . . are part and parcel of a single project." The petitioners thus argue that DES issued the add-fill permit after improperly considering "only a portion of the impacts of [the] proposed project."

■ Res judicata does not apply here because the first action sought a writ of mandamus that did not issue.

A writ of mandamus is used to compel a public official to perform a ministerial act that the official has refused to perform, or to vacate the result of a public official's act that was performed arbitrarily or in bad faith. This court will, in its discretion, issue a

> writ of mandamus only where the petitioner has an apparent right to the requested relief and no other remedy will fully and adequately afford relief.

*Petition of CIGNA Healthcare*, 146 N.H. 683, 687 (2001) (citation omitted). "When an official is given discretion to decide how to resolve an issue before him, a mandamus order may require him to address the issue, but it cannot require a particular result." *Rockhouse Mt. Property Owners Assoc. v. Town of Conway*, 127 N.H. 593, 602 (1986). Although "[i]t is well settled that the doctrine of res judicata is applicable to judgments in mandamus and prohibition proceedings,"

> [i]t is axiomatic that the doctrine will not operate unless the judgment was rendered upon the merits, and in several cases the courts have declined res judicata effect to judgments denying a writ of mandamus . . . where the judgment was not rendered upon the merits of the application.

Annotation, *Judgment Granting or Denying Writ of Mandamus or Prohibition as Res Judicata*, 21 A.L.R. 3D 206, 213 (1968).

▉ In *Morrissey I*, we did not address the merits of the petitioners' request for mandamus, leaving intact the trial court's ruling that the request was both too general and too specific to permit mandamus relief Because the petitioners did not obtain a ruling on the merits, *i.e.*, a determination as to DES's obligation to regulate the Town's activity relative to the water level of Post Pond, their petition in *Morrissey I* does not bar their present appeal.

▉ ▉ The Town next invokes the doctrine of collateral estoppel, which "bars a party to a prior action . . . from relitigating any *issue or fact* actually litigated and determined in the prior action." *Appeal of Town of Seabrook*, 163 N.H. at 654 (quotation omitted, emphasis added).

> Under certain circumstances, collateral estoppel may preclude the relitigation of findings made by an administrative board when: (1) the issue subject to estoppel is identical in each action; (2) the first action resolved the issue finally on the merits; (3) the party to be estopped appeared in the first action or was in privity with someone who did; (4) the party to be estopped had a full and fair opportunity to litigate the issue; and (5) the finding at issue was essential to the first judgment.

*Petition of Kalar*, 162 N.H. 314, 320-21 (2011).

The Town argues that this appeal is precluded by a finding by the trial court that we mentioned in *Morrissey I* when addressing the merits of the

petitioners' private nuisance claim. In *Morrissey I*, we noted that "the trial court found that the Town is not legally obligated to maintain the pond at a level above the natural low-water mark; nor do the petitioners have the right to have the pond maintained above the natural low-water mark." *Morrissey I*, 162 N.H. at 781 (quotations and brackets omitted). The Town argues that, because of the finding that the petitioners have no property rights in the water level of Post Pond, they cannot make a showing of infringement under RSA 482-A:11, II (2001). Pursuant to RSA 482-A:11, II, "[n]o permit to dredge or fill shall be granted if it shall infringe on the property rights or unreasonably affect the value or enjoyment of property of abutting owners."

█ The Town's collateral estoppel argument fails on the first prong because the question of whether the Town is legally obligated to maintain the water level of Post Pond above or below a certain level is not at issue in this appeal. Rather, the question before us is whether DES properly declined to consider the Town's activity relative to the water level in the pond because the activity did not itself require a wetlands permit. The Town's argument also fails on the fifth prong: the finding upon which the Town relies was far from essential to the judgment in *Morrissey I*. We mentioned it in passing and rested our rejection of the petitioners' private nuisance claim upon altogether different grounds. *See id.* at 782.

We therefore proceed to the merits of the appeal. The petitioners argue that the Council erred in finding that DES lacks regulatory authority over the Town's activity of lowering the water level in Post Pond. The petitioners contend that the Town's construction of beaver pipes and removal of beaver dams triggers DES's authority under RSA 482-A:3, I(a), which prohibits "remov[al] . . . or construct[ion of] any structures in . . . any waters of the state without a permit from [DES]." According to the petitioners, by concluding that DES lacks authority over changes in the water level, DES created a "loophole" in the wetlands statute, whereby "any land owner that wishes to drain wetlands . . . could do so without obtaining a dredge and fill permit simply by claiming a change in water level as the purpose of the proposed excavation."

█ The purpose of the wetlands statute is to protect and preserve wetlands for the public good and welfare. RSA 482-A:1 (2001). "[T]he title of chapter 482-A strongly indicates that the legislature intended it to protect wetlands . . . from the effects caused by dredging and filling within their boundaries." *Greenland Conservation Comm'n*, 154 N.H. at 534. The permitting provision, RSA 482-A:3, effectuates the wetlands statute's purpose. *Id.* at 535.

 In ruling that it lacked permitting authority over the Town changing the water level in Post Pond, the Council relied upon the absence of "water level changes" from the activities listed in RSA 482-A:3, I(a) requiring a permit. Indeed, DES's permitting authority is limited to the activities enumerated in RSA 482-A:3, I(a).

> DES is authorized to grant permits for certain enumerated construction activities in or on banks, flats, marshes and swamps in and adjacent to state waters. DES is not authorized to grant dredge and fill permits for construction activities not listed in the statute or conducted anywhere other than the places listed in the statute. The permitting process described in RSA 482-A:3, I, is the way the legislature has determined that DES shall carry out the purposes described in RSA 482-A:1.

*Id.* (citations omitted).

DES's administrative rules set forth a number of criteria that DES must consider when evaluating a permit application under RSA 482-A:3, I(a). N.H. ADMIN. RULES, Env-Wt 302.02. One criterion is that, "for any major or minor project, the applicant shall demonstrate by plan and example" that the applicant has considered a number of factors "in the project's design in assessing the impact of the proposed project to areas and environments under [DES's] jurisdiction." N.H. ADMIN. RULES, Env-Wt 302.04. These factors include "[t]he relationship of the proposed wetlands to be impacted relative to nearby wetlands and surface waters" and "[t]he impact of the proposed project on the values and functions of the total wetland or wetland complex." N.H. ADMIN. RULES, Env-Wt 302.04(a)(4), (17).

 Pursuant to DES's administrative rules, to obtain a permit under RSA 482-A:3, I(a), the applicant must demonstrate — and consequently, DES cannot decline to address — the total wetlands impact of the proposed project. *See* N.H. ADMIN. RULES, Env-Wt 302.04(a)(4), (17). If, when assessing this impact, DES could consider only activity that itself requires a permit, its regulatory authority would be severely curtailed and the purpose of the wetlands statute ill-served. Such a reading would also effectively nullify many, if not most, of the complex and multifaceted factors listed in Rule 302.04. For example, RSA 482-A:3, I(a) does not authorize DES to issue a permit for a project based upon its impact "on, public commerce, navigation and recreation." Nevertheless, an applicant must show, and DES cannot decline to consider, any such impact when evaluating a project proposal that falls within its permitting authority under RSA 482-A:3. *See* N.H. ADMIN. RULES, Env-Wt 302.04(a)(8). We will not

interpret an administrative rule in such a way as to render a significant portion of it meaningless. *See Appeal of Murdock*, 156 N.H. 732, 736 (2008).

The Council took the overbroad position that, "absent a specific reference in RSA 482-A:3, I(a) to 'water level changes,'" the Bureau and Council do not have "authority under RSA 482-A over the effects of water level changes." An activity within DES's permitting authority may result in a change in water levels, and DES would necessarily have to consider the "effects of water level changes" as part of the total wetlands impact of the permitted activity. For example, the installation of beaver pipes, which also results in changes in water levels, is undisputedly within DES's permitting authority: in 2006, the Town obtained a permit under RSA 482-A:3 to install a beaver pipe, and the Bureau noted that operating the beaver pipe "will impact on the water levels of the pond."

The Bureau and Council erred when they declined to consider the Town's practice of lowering the water level in the pond. This practice, although omitted from the Town's add-fill permit application, constituted part of the project to add fill and had a bearing on its total wetlands impact. The Town adopted a new water release policy in 2008 "for purposes of breaching the dams to lower the water in Post Pond." The Town admits that the policy of maintaining the water level in Post Pond at two feet, and the breaching of beaver dams to maintain that water level, "was done to expand the town beach and reduce the cost of improvements to the Town's playing fields." In order to "improve existing Town recreation facility athletic fields, the picnic area and to retain sand placed on the beach," the Town applied to DES for the add-fill permit. To obtain such a permit, the Town had to describe, and the Bureau had to consider, the total wetlands impact of the proposed project. Based upon the record, however, the Town's activity relative to the water level in Post Pond had a wetlands impact that, at best, was not supported by sufficient information for the Bureau to evaluate and, at worst, was detrimental.

The Bureau considered the add-fill permit application at the same time as the after-the-fact application to retain two beaver pipes: it held one hearing on both applications. Moreover, the Bureau noted that the after-the-fact application "appear[s] to be directly connected to a larger pending application." It denied the after-the-fact permit application, having found that "the project will cause unnecessary destruction of wetlands." At the same time, the Bureau approved the add-fill permit application, based in part on a finding "that th[e] proposal [wa]s the alternative with the least adverse impact to areas and environments under [DES's] jurisdiction" and that "[n]o changes in water quality or level shall occur as a result of this project." When the petitioners appealed, the Bureau clarified that it merely

found "that no changes in water quality or level 'shall occur' (*or were authorized*) as a result of this project." (Emphasis added.) We conclude that, by declining to consider the Town's lowering of the water level in Post Pond when issuing the add-fill permit, the Bureau failed to consider the total wetlands impact of the proposed project.

We disagree with the Town that the Council properly declined to consider the Town's activity relative to Post Pond because DES's authority is limited to the activities listed in RSA 482-A:3 and because the water level dropped as a result of beaver dams becoming abandoned and derelict rather than "any activity within the scope of RSA 482-A:3." Even if the water level in the pond dropped as a result of dam abandonment rather than any action taken by the Town, the Town's practice of lowering the water level, together with, or notwithstanding, beaver activity, was part of the wetlands impact of the project to add fill to the recreation fields: the Bureau could not decline to consider it.

■■■ Insofar as the petitioners argue that, when considering the add-fill permit application, the Bureau and Council should have required the Town to obtain separate wetlands permits to remove beaver dams and install beaver pipes, we reject this argument. The Town did apply for a permit to install a beaver pipe in 2006 and to retain two beaver pipes in 2009. These applications are not before us. As for beaver dams, any argument that the Town should have procured a wetlands permit in order to remove these structures has not been preserved. The petitioners failed to raise it in their appeal to the Council, see RSA 482-A:10, IV-a ("Only those grounds set forth in the notice of appeal shall be considered by the council."), and in their motion for reconsideration, see *Appeal of Coffey*, 144 N.H. 531, 533 (1999) ("Issues not raised in the motion for rehearing cannot be raised on appeal.").

The petitioners argued before the Council and argue on appeal that the Bureau improperly relied upon New Hampshire Administrative Rule, Env-Wt 303.05(j), a provision that allows the removal of a beaver dam without a permit in certain circumstances, when the Bureau concluded that "DES wetlands regulations have no ability to control the water level in Post Pond." In declining to consider the Town's lowering of the water level, the Bureau relied predominantly upon what it perceived to be its statutory authority under RSA 482-A:3. It merely noted that "beaver dams may be removed and their impoundments released without a wetlands permit pursuant to [Rule] 303.05(j)," and on appeal, the Council expressly stated that this regulation was not the basis for the Bureau's rulings. The record supports this conclusion. We therefore need not address the petitioners' arguments that: (1) the Bureau acted unlawfully and unreasonably when it

relied upon Rule 303.05(j); (2) the Council erred when it found that the petitioners waived this argument; and (3) Rule 303.05(j) is facially invalid because it conflicts with RSA 210:9 (2011).

We note that this opinion does not address whether the Town is correct that, as the claimed owner of the beaver dams, it has the authority to set the water level of Post Pond at or above the natural low water mark. The scope of a municipality's and DES's authority, if any, to regulate the water level of a great pond by means of beaver dams and beaver pipes is not squarely before us. Rather, the issue before us is whether, when DES evaluates a permit application involving an activity that falls within the scope of RSA 482-A:3 (adding fill), it may decline to consider a related activity (setting water levels) that itself may not require a wetlands permit but has a bearing on the total wetlands impact of the proposed project. We answer in the negative. Accordingly, we need not address the Town's argument that "even if RSA 482-A:3 granted DES the authority to regulate water levels," the record supports the conclusion that "permitting the Town to maintain a water level of 2.0 feet would be reasonable."

Because the Bureau misinterpreted RSA 482-A:3, I(a) and did not consider the total wetlands impact of the proposed project, we vacate and remand to the Council for further proceedings consistent with this opinion.

*Vacated and remanded.*

HICKS, CONBOY, LYNN and BASSETT, JJ., concurred.